UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

HODGE MILLER, JACKIE HATFIELD, II,
JON HATFIELD, CHRIS JUSTICE,
ROD TINCHER, GREGORY SCOTT,
TERRY DILLON, JERRY BAISDEN,
RODNEY STACEY, MICHAEL STANLEY,
DONALD MARCUM, JAMES ALLEY,
RANDALL LESTER, WILLIAM SMITH, II,
RICHARD BALDWIN, TIM SHEPPARD,
BOBBY SCOTT, JR., RODNEY GOFF,
WALTER FORD, SR., GARY MOON,
MICHAEL ROBINSION

    Plaintiffs

v.                       Civil Action No.: 2:03-0514

NORFOLK SOUTHERN RAILWAY
COMPANY, a foreign corporation

    Defendant

MEMORANDUM OPINION AND ORDER

       Pending before the court is the motion of defendant Norfolk Southern Railway Company to dismiss for lack of subject matter jurisdiction, filed June 23, 2003, which seeks to dismiss the complaint on the grounds that all of the asserted causes of action are preempted by the Railway Labor Act, 45 U.S.C. §§ 151, et seq ("RLA").

I.

In April 2000, the plaintiffs, residents of either West Virginia, Kentucky or Tennessee, were all employed as "carmen" in the Williamson yard facility operated by the defendant Norfolk Southern Railway Company ("NSRC").[1]  Carmen generally perform the work of maintaining and repairing rail cars and the carmen collectively constitute a single "craft" or collective unit employed by NSRC.  All plaintiffs except Goff were furloughed from NSRC's employ in a reduction in force in April, 2000.  Goff was furloughed in a reduction in force in December, 2000.[2]

NSRC operates an interstate railroad system in the eastern United States and portions of Canada and is a corporation organized pursuant to the laws of Virginia.  It also maintains its principal place of business in Norfolk, Virginia.  Not. Removal at ¶ 11.  NSRC is considered a "carrier" within the

---

[1]Five of the plaintiffs, Jerry Baisden, Randall Lester, Tim Sheppard, Rodney Goff and Walter Ford, Sr., claim Mingo County, West Virginia as the location of their respective residencies. Compl. at ¶¶ 9, 14, 17, 19–20.  The plaintiff Rodney Stacey is a resident of Tennessee.  Id. at ¶ 10.  The 15 remaining plaintiffs claim Pike County, Kentucky as the location of their respective residencies.  Id. at ¶¶ 2–8, 11–13, 15–16, 18, 21–22.

[2]It is unclear whether Goff participated in the April 10, 2000, meeting at the Brass Tree restaurant.  See infra p. 4. There are no individual allegations concerning representations made to Goff.

2

meaning of the RLA.  45 U.S.C. § 151.

For all times relevant to the complaint, the Brotherhood Railway Carmen Division-Transportation Communication International Union ("Carmen Union") was the recognized collective bargaining representative for those employed as carmen at NSRC.  Dec. Anthony J. Licate at ¶¶ 2 & 4.  Since September 1, 1949, NSRC or its predecessors and the Carmen Union have operated under a collective bargaining agreement ("CBA") governing the rates of pay, rules and working conditions of the carmen employed in the Williamson yard.  Id. at ¶¶ 8-9.  The CBA was in operation during the plaintiffs' time of employment with NSRC prior to the reduction in force and is the source of the plaintiffs' seniority and call back rights.  Id. at ¶ 9.

On or about May 30, 2003, the plaintiffs filed a complaint in the Circuit Court of Mingo County asserting claims of fraud and intentional misrepresentation concerning certain representations made individually and collectively by NSRC subsequent to the announcement of the reduction in force.  See Compl.  On June 6, 2003, NSRC filed its notice of removal claiming that this court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1332 (diversity jurisdiction).  Not. Removal.

3

Inasmuch as the plaintiffs claim that agents of NSRC made materially false representations in an effort to divest the plaintiffs of seniority and call back rights earned during their respective terms as carmen, NSRC contends that such claims are completely preempted by the RLA.  NSRC also claims, and the court finds, that jurisdiction is present because the parties are diverse and the amount in controversy exceeds $75,000. Plaintiffs have not sought to remand the matter.

According to the allegations of the complaint, notice was given to the plaintiffs by NSRC on April 7, 2000, of an immediate reduction in force.  Compl. at ¶ 25.  A meeting involving affected personnel and NSRC agents was scheduled to take place on April 10, 2000, at the Brass Tree restaurant in Williamson.  Id.  Prior to that meeting, several plaintiffs attempted to secure other positions with NSRC but were informed by agents of NSRC that successful applicants for those positions would have to forfeit any accrued seniority or call back rights as carmen.  Id. at ¶¶ 26–29.  These plaintiffs were further informed by NSRC's agents at the Williamson yard that the furlough was expected to last two to three months.  At the time of the first reduction in force, the plaintiffs' respective accrued rights were all within the range of nine to twelve years.

4

See id. at ¶ 41.

The Brass Tree meeting took place on April 10, 2000.
Dave Dixon, NSRC's "hiring officer," spoke at that meeting and
advised the plaintiffs that there were a number of brakemen and
conductor positions available in locations other than the
Williamson yard.  He informed the plaintiffs that successful
applicants would have to waive their seniority and call back
rights to be considered for those positions.  Id. at ¶ 30.  While
the complaint indicates that the available positions were in
crafts other than carman, it does not indicate how many positions
or the location of those positions.

When queried by the plaintiffs about NSRC's requirement
to forego the accrued rights, Dixon told them that "Defendant
NSR[C's] policy did not allow an individual to simultaneously
hold seniority in more than one craft."  Id. at 31.  Because they
would be required to forego accrued rights, plaintiffs declined
to apply for the positions.

In September 2001, agents of NSRC contacted plaintiffs
Miller, Justice and Dillon to advise them of an opening for
Apprentice Electrician in the Williamson yard.  Id. at ¶¶ 34-35.
To be considered for that position, the plaintiffs understood

5

that they would still have to relinquish their seniority and call
back rights.  Id.  All three declined to do so.  Id.

        Also in September 2001, plaintiff Sheppard and another
furloughed carman, G.D. Slate, were hired as conductors for the
Dickerson yard in Charleston, West Virginia.  Id. at ¶ 36.  They
commenced accruing seniority and call back rights in their
positions as conductors.  Sheppard and Slate were called back on
May 30, 2002, to their former positions as carmen in the
Williamson yard.  Id. at ¶ 37.  On or about the same day, the
twenty remaining plaintiffs were also recalled and reinstated to
their former positions.  Id. at ¶ 38.  The plaintiffs allege that
Sheppard and Slate were reinstated to their carmen positions and
retained the same seniority and call back rights that they
possessed at the time of their furlough in April 2000.  Id. at ¶
37.

        Plaintiffs state that "the material misrepresentations
of Defendant NSR[C]'s agents [were] intentional and [were]
designed to discourage the Plaintiffs from seeking jobs in other
crafts so that persons with less seniority and lower rates of pay
could be hired to fill the open positions."  Id. at ¶ 42.
Plaintiffs claim these misrepresentations constitute common law
fraud.  Id. at ¶¶ 43-48.  Plaintiffs also claim independently

                                6

that NSRC intentionally misrepresented company policy.  Id. at ¶¶
49-52.  As a result of these misrepresentations the plaintiffs
claim loss of income, loss of employment benefits, and emotional
and mental damages.  Plaintiffs also seek punitive damages and
reasonable attorney fees.

Subsequent to removing this civil action, NSRC filed
its motion to dismiss for lack of subject matter jurisdiction,
arguing that, under section 3 of the RLA codified at 45 U.S.C. §
153, the claims of the plaintiffs were subject to mandatory
arbitration and, as such, the court has no jurisdiction over the
subject of the dispute.  Although plaintiffs assert state law
claims, NSRC contends that the seniority and call back rights at
the heart of the complaint are derived solely from the CBA.  NSRC
further contends that the plaintiffs must be alleging NSRC
infringed those rights.  Inasmuch as plaintiffs' claims
necessarily turn on interpretations of the CBA, NSRC argues those
claims are preempted.

In support of its motion to dismiss, NSRC has filed two
declarations of Anthony J. Licate, the Director of Labor
Relations of Norfolk Southern Corporation, the parent corporation
of NSRC.  Licate has held his title since May 16, 1998, and he is
"responsible for among other things, negotiating, interpreting

7

and administering the collective bargaining agreements entered into by [NSRC] and various labor organizations representing NSR employees, including the [Carmen Union]." Dec. Licate at ¶ 2. He states that the plaintiffs were all covered employees under the CBA.  Id. at ¶ 3.  He asserts that:

> The [CBA], among other things, sets forth the rules governing the seniority rights of carmen.  (The pertinent seniority rules from [the CBA] are attached hereto as Exhibit 1.)  Plaintiffs, at the time relevant to this lawsuit, held seniority as carmen by virtue of [the CBA].  Plaintiffs' seniority rights as carmen were entirely a product of, and were defined by, that labor agreement.  If plaintiffs had any right to retain their carmen seniority when they took jobs in other crafts, that right would necessarily be founded on [the CBA].

Id. at ¶ 9.  He continues stating that:

> [NSRC's] position is that [the CBA] did not give a furloughed carmen the right to retain their carman seniority if they took jobs in other crafts. Similarly, [NSRC's] position is that [the CBA] did not prevent [NSRC] from requiring furloughed carmen to relinquish their seniority as a condition of taking jobs in other crafts. [NSRC's] view is that the agreement left this determination to [NSRC's] managerial discretion.

Id. at ¶ 10.


        This managerial discretion is left to the "appropriate operating unit level."  Id. at ¶ 12.  Typically, although not always, NSRC requires furloughed employees to relinquish their seniority in other crafts as a precondition of accepting trainman or conductor positions.  Id.  "The principal reason [NSRC]

generally requires employees to give up their other seniority is that [NSRC] does not want to invest the considerable time and expenses of training employees in a new job only to see them turn around and return to their old craft." Id.  Attached as Exhibit 1 to the affidavit is a portion of the CBA in effect at the time the events occurred.  Rule No. 30 pertains to seniority and by joint stipulation filed on July 27, 2006, the parties have agreed that this rule governed the seniority of carmen.[3]

In his second declaration, Licate addressed certain contentions of the plaintiffs concerning the subsequent

_____

[3]Rule No. 30 provides:

> Seniority of employees in each craft will be confined to the Mechanical Department at the point employed (Roanoke Shops and Portsmouth Back Shop each to be considered as a point) and separate seniority rosters maintained as follows:
>
> [listing among other positions "Carmen, Freight"]
>
> Employees assigned as Carpenters, General will be allowed to hold their original seniority in the craft from which selected.
>
> Except as provided for in Rule 33, employees assigned as Welders will be allowed to retain their original seniority in the craft from which selected.
>
> Seniority lists will be posted annually and copy furnished the committee.

Rule 30 attached as exhibit to Jt. Stip., filed July 27, 2006.

unconditional employment in September 2001 of plaintiff Sheppard

and one other furloughed employee as a conductor in the Dickerson

Yard.  Licate states that:

> The conductor jobs at the Dickerson Yard obtained by
> Mr. Slate and Mr. Sheppard were not among the trainmen
> or conductor jobs that were the subject of the meetings
> between [NSRC] officers and plaintiffs that are
> referred to in paragraphs 26 through 30 of the
> Complaint. [NSRC] was not recruiting trainmen or
> conductors for jobs at Dickerson Yard when those
> meetings with plaintiffs (and other furloughed carmen)
> took place in the year 2000.  The trainmen and
> conductor positions for which the [NSRC] officers were
> then recruiting were located at points on the NSRC
> system other than Dickerson Yard.

2nd Dec. Licate at ¶ 2.

        The plaintiffs oppose the motion to dismiss noting,

without support, that NSRC, by filing its notice of removal,

waived any challenge it may have had to the court's subject

matter jurisdiction.  This argument fails inasmuch as removal was

proper and NSRC has the right to assert its defenses including

challenges to subject matter jurisdiction.  14C Wright Miller &

Cooper, Fed. Prac. & Proc. § 3738 (3d ed. 1998) ("[t]he governing

principle is that the defendant does not waive any defense by

removing the case to federal court.").  However, the principal

argument advanced in opposition by the plaintiffs is that § 3 of

the RLA, specifying mandatory arbitration, was not intended to

preempt state law claims when such claims exist independently

from the operative CBA.[4]

II.

The purpose of a motion made pursuant to Rule 12(b)(1) is to challenge the court's jurisdiction over the subject of the parties' dispute.  See Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999).  In considering a Rule 12(b)(1) motion,  a district court "is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."  Richmond, Fredericksburg & Potomac R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991).  "The district court should grant the Rule 12(b)(1) motion to dismiss 'only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.'" Evans, 166 F.3d at 647 (quoting Richmond, Fredericksburg & Potomac R., 945 F.2d at 768 (4th Cir. 1991).

---

[4]While the plaintiffs also note that they did not include the CBA within the scope of their allegations, there is no real dispute that the identified seniority and call back rights are derived from the CBA.  The mere fact that plaintiffs have attempted to artfully plead their claims so as to avoid all reference to the CBA is not dispositive of the issue before the court on this motion.  Gore v. Trans World Airlines, 210 F.3d 944, 949 (8th Cir. 2000).

11

III.

The RLA was passed by Congress "to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." Hawaiian Airlines v. Norris, 512 U.S. 246, 251 (1994).  To achieve this purpose, the RLA establishes an arbitration scheme for the prompt resolution of two categories of disputes -- major and minor.  Id.  "Minor disputes grow 'out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions,' 45 U.S.C. § 151a, and they 'involve controversies over the meaning of an existing collective bargaining agreement in a particular fact situation.'"  Monroe v. Missouri Pacific Railroad Co., 115 F.3d 514 (7th Cir. 1997) (quoting Norris, 512 U.S. at 252–54).  The RLA's arbitration forum is the sole jurisdiction for resolution of minor disputes and, therefore, preempts the courts, whether state or federal, from resolving minor disputes.  Preemption attaches "where the resolution of a state law claim depends on an interpretation of the CBA."  Norris, 512 U.S. at 261.  The parties are in agreement that, to the extent the RLA is relevant, the dispute at issue here should be categorized as a minor dispute.

However, such preemption will not apply to state and

12

even federal causes of action which exist independently from rights conveyed by the CBA.  Id. at 260.  "'[P]urely factual questions' about an employee's conduct or an employer's conduct and motives do not 'requir[e] a court to interpret any term of a collective-bargaining agreement.'"  Id. at 261.  Additionally, a "mere need to reference or consult a collective bargaining agreement during the course of state court litigation does not require preemption."  Gore, 210 F.3d at 949 (8th Cir. 2000). Moreover, the Tenth Circuit has held that:

> [A] state law claim is not automatically preempted simply because the facts underlying the claim may also support an action pursuant to a CBA.  In fact, resolution of a state law claim may require precisely the same factual analysis as resolution of the same problem under a CBA and still not require any application or interpretation of the CBA.  Thus, where resolution of a state law claim requires a pure factual inquiry that does not turn on the meaning of any provision in the collective bargaining agreement, the claim is not preempted by the RLA.

Ertle v. Continental Airlines, Inc., 136 F.3d 690, 693 (10th Cir. 1998).

        In Gore, the Eighth Circuit held that the preemption analysis should focus "on a determination of whether the state-law claim 'confers nonnegotiable state law rights on employers or employees independent of any right established by contract, or, instead, whether evaluation of the tort claim is inextricably

intertwined with consideration of the terms of the labor contract.'" <u>Gore</u>, 210 F.3d at 949 (quoting <u>Allis-Chalmers Corp.</u> <u>v. Lueck</u>, 471 U.S. 202 (1985).  The Ninth Circuit has stated that "[w]here a plaintiff contends that an employer's actions violated rights protected by the CBA, there is a minor dispute subject to RLA preemption." <u>Espinal v. Northwest Airlines</u>, 90 F.3d 152, 1456 (9th Cir. 1996).

In its motion, NSRC contends that the plaintiffs' state law claims should be preempted because the issues raised require the court to apply or interpret provisions of the CBA.  In support of this position, NSRC attaches the declaration of Anthony J. Licate indicating that the allegedly actionable representations identified in the complaint were made by NSRC in accordance with NSRC's interpretation of the CBA which concludes that individual employees may not simultaneously hold seniority or call back rights in two crafts.  NSRC asserts that the plaintiffs must resort to interpreting the CBA in order to demonstrate that the alleged representations were false and, therefore, resolution of this dispute falls within the exclusive province of § 3 of the RLA.

Plaintiffs oppose, arguing that their claims arise under West Virginia law and asserting that the representations as

14

pled in the complaint arise independently from any interpretation of the CBA. Plaintiffs urge that, inasmuch as their claims exist independently of the CBA, the motion to dismiss should be denied.

Plaintiffs further contend that the origin of their seniority rights is immaterial and that the court is not being called upon to pass on the existence of such rights. Rather, the plaintiffs assert that they "relied upon misrepresentations of defendant's agents that before they applied for the positions within the Defendant's company during their forced layoff, they would be required to forfeit any seniority or callback rights they may have accumulated in their Carman position." Pls.' Resp. at ¶ 3. Inasmuch as there is no conflict regarding the existence or duration of the seniority rights accrued by the plaintiffs during their course of employment with NSRC as carmen, plaintiffs suggest that the CBA is implicated, at best, tangentially because it is the source of the seniority rights and that the court does not need to resort to interpreting the CBA to resolve their claims.

Plaintiffs support their position by asserting that the CBA does not contain an express provision governing this set of circumstances and, thus, the subject matter of their complaint falls outside § 3 of the RLA. Plaintiffs insist that the falsity

15

of NSRC's position may be inferred by the subsequent
unconditional hiring of plaintiff Sheppard and the other
furloughed employee as conductors in the Dickerson yard.  They
also appear to posit that resolution under § 3 of the RLA is
unavailable as an avenue of relief for their particular claim
inasmuch as the "factual situation that gave rise to the
[c]omplaint of the [p]laintiffs did not present a grievable
issue."  Pls.' Memo. in Resp. to Def.'s Mot. to Dismiss at 4.

        Kollar v. United Transportation Union, 83 F.3d 124 (5th
Cir. 1996), a case with some similarity to this one, is
instructive on the issue presented here.  In Kollar, the Fifth
Circuit affirmed the district court's grant of summary judgment
to the defendant on the ground that the RLA preempted plaintiffs'
state law claims of fraud.  The fraud was predicated on allegedly
false representations made by the union concerning seniority
rights.  Those misrepresentations were allegedly designed to
entice employees of Southern Pacific to transfer to Amtrak.  Id.
at 125.  In affirming the district court's holding that RLA
preemption applied, the Fifth Circuit noted that

    To prove the falsity of the representations, Plaintiffs
    would have to show that the relevant seniority
    provisions of the CBA, the transfer agreement, and
    modifying letter agreement, differ from the
    representations made by the Union.  This requires
    interpretation of the CBA left appropriately to

16

procedures established under the RLA.

Id. at 126.  The Fifth Circuit further noted that other circuits

addressing the question have similarly found state-law fraud

claims, premised on a denial of seniority, preempted under the

RLA.  Id. (citing Allen v. United Trans. Union, 964 F.2d 818,

821-22 (8th Cir. 1992); Melanson v. United Airlines, Inc., 931

F.2d 558 (9th Cir. 1991)).

      The court finds that plaintiffs' claims should be

dismissed as preempted by § 3 of the RLA.  The linchpin of

plaintiffs' complaint is the purported misrepresentations made to

them by representatives of NSRC concerning the relinquishment of

plaintiffs' seniority rights as a prerequisite to applying for

other positions with NSRC in different crafts.  Those

representations were based upon a company policy which, according

to Licate, represents the exercise of NSRC's managerial

discretion under the CBA.

      Under West Virginia law, in order to vindicate any of

their claims, whether based on fraud, misrepresentation or

detrimental reliance, the plaintiffs must show that NSRC's

representations were false.[5]  Whether those representations were

---

      [5]West Virginia law provides, "[t]he essential elements in an
action for fraud are: '(1) that the act claimed to be fraudulent
was the act of the defendant or induced by him; (2) that it was

17

in fact false is, in essence, dependent on the extent to which seniority rights arising under the applicable CBA are transferrable to other crafts and the extent to which NSRC appropriately applied its managerial discretion.  Contrary to the plaintiffs' contention, the dispute does squarely implicate the CBA and, like <u>Kollar</u>, its resolution necessarily requires the court to delve into and interpret the rights of the parties under the CBA.  To hold otherwise would create the peculiar result whereby a misrepresentation regarding seniority rights would give rise to a civil action, even though an actual violation of plaintiffs' seniority rights would not.  See <u>Brown v. Missouri Pacific R. Co.</u>, 720 S.W.2d 357, 360 (Mo. 1986) ("[i]t would be strange if a threatened discharge, never carried out, should give rise to a civil action [under the RLA] when actual discharge would not.").  The court, accordingly, finds that the plaintiffs' state law claims are dependent upon an interpretation of the CBA.

The fact that ultimately two furloughed employees were unconditionally hired by an NSRC operation during September 2001 is immaterial.  This factual allegation is not sufficient in the

_____

material and false; that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied upon it.'" Syl. Pt. 1, <u>Lengyel v. Lint</u>, 280 S.E.2d 66 (W. Va. 1981) (<u>citing</u> <u>Horton v. Tyree</u>, 139 S.E. 737 (W. Va. 1927)).

context of the remaining allegations to show a misrepresentation arising independently from a consideration of the CBA. Plaintiffs allege that in April 2000, they were offered the opportunity to apply for conductor and brakemen positions with NSRC in exchange for relinquishing their seniority rights as carmen.  Thereafter, in September 2001, three of the plaintiffs were advised of an employment opportunity with NSRC as an Apprentice Electrician at the Williamson yard conditioned upon relinquishment of their seniority rights.  The factual circumstances surrounding the two conditional offers differ from that of the September 2001, unconditional offer accepted by the two furloughed carmen.  More specifically, the April 2000, conditional offer was made approximately a year and a half prior to the September 2001, unconditional offer to Sheppard and Slate and did not involve the same conductor positions that were accepted by those two furloughed carmen.  Second Dec. Licate at ¶ 2.  Similarly, the September 2001, conditional offer made to three of the plaintiffs involved an Apprentice Electrician position, not the conductor or brakemen positions offered in April 2000.

        At best, the unconditional offer merely demonstrates that two furloughed employees were treated inconsistently under

NSRC's company policy with respect to specific job offers that are unrelated to the conditional offers.  The allegation alone or collectively with the balance of plaintiffs' remaining allegations does not support the contention that NSRC, at the time of any of the conditional offers, made a false representation with respect to those offers.  The allegation only shows that in one particular set of circumstances an NSRC operation decided to deviate from the stated company policy. Regardless of this allegation, plaintiffs, to demonstrate a misrepresentation, must still show that they had a right to retain their seniority at the time the prior representations were made.  Such a showing still requires an interpretation of the applicable CBA relating to seniority rights.  This factual allegation, therefore, is insufficient to permit the conclusion that plaintiffs' state law claims fall outside the CBA.

Plaintiffs also contend that they have no avenue of relief available to them under § 3 of the RLA.  This contention appears to be based, in part, on their erroneous conclusion that their fraud claims "were not complaints regarding rights created by the contract."  Pls.' Memo. in Resp. to Def.'s Mot. to Dismiss at 4.  Their argument is further undermined by the fact that the plaintiffs have not even attempted to pursue the remedies

afforded to them by section 3.  Consequently, plaintiffs'
unsupported contention does not serve to alter the conclusion
that the dispute presented is within the exclusive province of
§ 3 of the RLA and is preempted.

                              IV.

          For these reasons, it is ORDERED that defendant's
motion to dismiss for lack of subject matter jurisdiction be, and
it hereby is, granted.

          The Clerk is directed to forward copies of this order
to all counsel of record.

                         DATED: August 1, 2006


                         _____
                         John T. Copenhaver, Jr.
                         United States District Judge